#27784-a-JMK
**2016 S.D. 82**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

MARK BLACK,                                    Appellant,

v.

DIVISION OF CRIMINAL
INVESTIGATION,                                 Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SIXTH JUDICIAL CIRCUIT
HUGHES COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE JOHN L. BROWN
Judge

* * * *

TIMOTHY R. WHALEN
Lake Andes, South Dakota                       Attorney for appellant.


ROBERT B. ANDERSON of
May, Adam, Gerdes & Thompson, LLP
Pierre, South Dakota                           Attorneys for appellee.


* * * *

ARGUED OCTOBER 3, 2016
OPINION FILED **11/22/16**

KERN, Justice

[¶1.]        The South Dakota Division of Criminal Investigation (DCI) hired Mark Black as an agent in 2005.  Black entered DCI as a veteran law-enforcement officer and quickly distinguished himself as an excellent investigator.  However, DCI terminated Black's employment after a series of incidents and disciplinary actions.  Black exhausted each level of administrative review, including a hearing with the Civil Service Commission (CSC), which found just cause for his termination.  Black appealed that decision to the circuit court, which affirmed.  Black appeals.  We affirm.

## BACKGROUND

[¶2.]        DCI hired Black as an agent on August 5, 2005.  He entered DCI as an experienced law-enforcement officer and quickly became one of DCI's top five agents.  Black was the first to receive the newly created Distinguished Service Award in 2009.  His success and excellent performance evaluations, however, were accompanied by accounts of emotional instability and lapses in judgment.  In his first year on the job, for example, he received high praise on a September 7, 2006 performance evaluation.  But the evaluation also said Black needed "to continue to remind himself to maintain his composure and not allow his emotions to take over."  Black's evaluations contained similar warnings for the next several years, including one report in 2008 that stated: "Mark on occasion makes poor decisions with regards to his relationship with others.  Mark had at times a very difficult 6 month period and became frustrated and disappointed.  This became an issue when he sent a resignation email to all agents in the DCI and to the Attorney General."  The

email incident resulted in a two-day suspension, enrollment in a sixty-day work-improvement plan and counseling. Black successfully completed these programs.

[¶3.]     Problems also arose outside of work. On September 13, 2013, Black commented on the Keloland blog about a SWAT training event. Because his Facebook page showed he was a DCI agent, Black's comment on the Keloland blog appeared to have been made on behalf of DCI. Black commented: "This story is an excellent example of a waste of time by the media. This 'mother' would rather whine to get her face on camera than be a parent and explain to her child, it is the people that protect us practicing to keep us safe from bad guys." DCI disciplined Black with a one-day suspension. Black also made a tape recording in the Brown County courthouse in Aberdeen, portions of which were transcribed by a third party and posted online as a YouTube video. The recording featured a conversation between Black and another DCI agent about an ongoing investigation while they were waiting to question an individual. Black used foul language and made inappropriate statements.

[¶4.]     In 2013, Black went through a contentious divorce with his now ex-wife, Patty Black. In June 2013, he spray painted the phrase "Patty wins" on the boat they jointly owned. The boat was parked in front of the marital home. Black and Patty finalized their divorce in August 2013.

[¶5.]     On February 13, 2014, Patty filed a petition for an ex parte temporary protection order against Black. Patty attached to her petition a handwritten letter from Black containing the following passages:

As for my temper, rage, and razor tongue, I finally figured out how bad I hurt everyone around me. Especially you. I said numerous hateful things . . . .

I know you feel like a victim . . . .

Yes babe I know I punched walls and doors, broke dishes, pictures.

. . . .

I pushed and shoved you as well for that I am sorry too. A[n] honest reflection is that we both mistreated each other . . . .

The court issued an ex parte temporary order of protection against Black. In light of the allegations in the letter, DCI required Black to surrender his service weapon. That same day, Black's supervisor, Brian Zeeb, began an investigation and placed Black on administrative leave. Because of the allegations of domestic abuse and further examples of Black's lack of emotional control and poor judgment, Zeeb sent a letter to Black on February 21, 2014. The letter informed Black that DCI intended to terminate his employment. The petition for a protection order was eventually dismissed.

[¶6.] In his letter Zeeb listed violations of the Administrative Rules of South Dakota (ARSD) 55:10:07:04(26) and DCI personnel policy manual rule (DCI Policy) 7.0101 as just cause for Black's termination. DCI gave Black the opportunity to be heard, and Black wrote a lengthy letter in response. Zeeb conducted an investigation that included review of documents at the Brown County courthouse, audio recordings, and text messages. At Zeeb's request, the North Dakota Bureau of Criminal Investigation conducted a separate investigation. Zeeb stood by his initial decision and on March 14, 2014, sent Black a letter outlining the factual and legal basis for the termination.

[¶7.] Black appealed Zeeb's decision to DCI Director Bryan Gortmaker. Director Gortmaker investigated and reconsidered Black's termination. He discovered a text message that he believed also warranted Black's termination. Black sent his wife a text on May 17, 2013, stating: "Not after I take the stand and admit to adultery. I told you I'll give you what u want. [By the way] I broke up w/Lynda." Lynda was Black's girlfriend at the time and now his spouse. Director Gortmaker had previously asked Black if he committed adultery, to which Black said no. He concluded that Black either lied to him or lied to his ex-wife. Either way, Director Gortmaker believed Black violated DCI Policy 7.0103, requiring "integrity" of agents, and 7.0101, prohibiting "unbecoming conduct" of an agent. Black would later testify that he did not lie to Director Gortmaker and that he took the text out of context. Nonetheless, Director Gortmaker affirmed Zeeb's decision. Black then appealed to Attorney General Marty Jackley who investigated and also affirmed Zeeb's decision.

[¶8.] Black appealed the decision to CSC and requested a hearing. CSC held the hearing on September 16, 2014. DCI presented four witnesses: Zeeb, DCI Supervisory Agent Jason Even, DCI Assistant Director Dan Satterlee, and Director Gortmaker. All of DCI's witnesses were Black's superiors. Zeeb worked directly with Black between 2005 and 2011. Even was Black's direct regional supervisor. Satterlee served with DCI for 20 years and knew and worked with Black for many years. Director Gortmaker served with DCI for twenty-five years, including six as DCI Director and was familiar with Black's work and struggles.

[¶9.] DCI offered exhibits and testimony including Black's performance evaluations, remarks on his capricious temperament and poor judgment, his comments on the Keloland blog, his handwritten letter to Patty, and many instances of erratic conduct. All of DCI's witnesses agreed that although Black was a skilled agent, he was emotionally unstable, which impaired his ability to exercise good judgment, a crucial attribute for DCI agents. Despite repeated attempts to help Black control his emotions and make good decisions, it became clear to Black's supervisors that he could not or would not effectively manage his anger. To assist Black, DCI used work-improvement plans, warnings, and administrative measures—all of which were ineffective in curtailing his behavior. DCI was especially concerned that Black's reputation was impaired, by the admissions in his handwritten letter of domestic violence, to the extent that he could not credibly investigate other law enforcement officers charged with similar misconduct.

[¶10.] In his defense, Black testified and presented six witnesses: McPherson County Sheriff Dave Ackerman, Brown County Sheriff Mark Milbrandt, Day County Sheriff Barry Hillstead, Marshall County Sheriff Dale Elsen, DCI Agent Dave Lunzman, and Lynda Black. Black described himself as a passionate and "emotional guy" and admitted to certain lapses in judgment. He claimed that Patty attempted to sabotage his career by spreading details of their divorce while continually harassing Black and Lynda. Black also introduced into evidence numerous certificates of commendation. With the exception of his wife, Black's witnesses were all law enforcement officers who worked with Black during his years with DCI. They all testified positively about his character and his exceptional

abilities as a DCI agent. Lynda testified about Patty's harassment and threats to destroy Black's career.

[¶11.] CSC issued extensive findings of facts and conclusions of law. CSC found that Black's behavior throughout his employment with DCI revealed an inability to deal with stressful situations and control his emotional reactions. Black displayed frustration, anger, and vindictiveness on repeated occasions, causing alarm in and outside of DCI. DCI repeatedly notified Black of their concerns over his misbehavior and attempted to work with him to improve his conduct. During the course of events concerning Black that became public, various law enforcement officers and agencies contacted Even and inquired about what was happening. There were also articles concerning Black in the Aberdeen newspaper and on the Internet that affected public knowledge and confidence in DCI. The role of DCI is unique; they "police the police." CSC concluded there was just cause to terminate Black's employment as his conduct both on and off duty adversely affected the morale and efficiency of DCI and diminished public confidence.

[¶12.] Black appealed CSC's decision to the circuit court. The circuit court heard oral argument on January 6, 2016, and on February 1, 2016, issued an incorporated memorandum holding that DCI had just cause to terminate Black's employment and that he received due process of law. The circuit court also affirmed CSC's holdings regarding the specific grounds for Black's termination, namely, violations of ARSD 55:10:07:04(26) and DCI Policy 7.0101. Black appeals, raising the following issues:

> 1. Whether CSC erred in finding DCI had just cause to terminate Black's employment.

2. Whether Black received due process of law.

## STANDARD OF REVIEW

[¶13.] "Our review of agency decisions is the same as the review made by the circuit court." *In re Jarman*, 2015 S.D. 8, ¶ 8, 860 N.W.2d 1, 5. We "give great weight to the findings made and inferences drawn by an agency on questions of fact." SDCL 1-26-36. We may reverse or modify an agency's findings if they are "[c]learly erroneous in light of the entire evidence in the record[.]" *Id.* Our review under the clearly erroneous standard is highly deferential, and we reverse only if review of the entire record has left us "with a definite and firm conviction that a mistake has been committed." *Osman v. Karlen & Assocs.*, 2008 S.D. 16, ¶ 15, 746 N.W.2d 437, 443 (quoting *Fin-Ag, Inc. v. Feldman Bros.*, 2007 S.D. 105, ¶ 19, 740 N.W.2d 857, 863).

## ANALYSIS

[¶14.]     1.     Whether CSC erred in finding DCI had just cause to terminate Black's employment.

[¶15.] Black makes several arguments challenging CSC's finding that DCI had just cause to terminate his employment. CSC's finding of just cause is based on violations of ARSD 55:10:07:04(26) and DCI Policy 7.0101. Black also claims that Director Gortmaker improperly added a violation of DCI Policy 7.0103 as grounds for his termination and challenges some of CSC's other factual findings as clearly erroneous.

*ARSD 55:10:07:04(26)*

[¶16.]     Black first challenges CSC's determination that Black violated ARSD 55:10:07:04(26).  Black claims that DCI failed to meet its evidentiary burden because it did not present witnesses from the general public to prove that Black's conduct spoiled their image of and confidence in DCI.  Black argues DCI instead presented testimony of its own employees, which was insufficient to prove harm to public trust in the State.  In response, DCI contends that the personal knowledge of its four law enforcement officers combined with Black's history of public acts was adequate to support CSC's determination.

[¶17.]     ARSD 55:10:07:04 lists the grounds for disciplinary action for "just causes," including conduct "within or outside the scope of employment."  Section (26) provides for termination if "[t]he employee has engaged in conduct either prior to or during employment with the State that reflects unfavorably on the State, destroys confidence in the operation of State services, or adversely affects the public trust in the State."

[¶18.]     We reject Black's argument that testimony or evidence from the general public is necessary for a determination of just cause under ARSD 55:10:07:04(26).  Black suggests that polling data or testimony from the public at large is required.  But this is an overly rigid manner of assessing harm to the State's reputation.  Such a requirement would be unworkable.  For example, who should be polled or called to testify about their views of DCI?  Where would these witnesses need to reside?  What sample size would DCI need to produce to

meet its burden of proof? Black cites no authority for his proposed rule or specifics for its implementation.

[¶19.] DCI offered the testimony of four high-ranking DCI employees. These witnesses had substantial experience observing and working with DCI agents, other law-enforcement agencies, and the public. They were charged with the duty of managing DCI and maintaining the public's trust and confidence in the agency. They supervised and worked with Black during his entire career with DCI and had personal knowledge of many of the events in question. Their opinions regarding his performance are corroborated by an ample record detailing the conduct that raised serious questions about his judgment and self-control. Of particular note, at least two of Black's actions were apparent to the general public as they transpired through the Internet—the Keloland blog comment and the tape recording from the Brown County courthouse posted on YouTube. We cannot say that CSC was clearly erroneous in finding that Black violated ARSD 55:10:07:04(26).

### A. DCI Policy 7.0101

[¶20.] DCI Policy 7.0101 prohibits "unbecoming conduct," providing that:

> Agents shall conduct themselves on and off duty in a manner that reflects favorably on the Division. Conduct unbecoming to an agent means conduct contrary to professional standards that show an unfitness to discharge duties or conduct which adversely affects morale or efficiency of the Division or diminished public confidence.

CSC found Black failed to conduct himself in a manner that "reflected favorably on the DCI." Additionally, CSC concluded that his behavior "both on and off duty adversely affected the morale and efficiency of the DCI and diminished public confidence." In support of these findings, CSC determined that the conduct

identified in Zeeb's termination letter and supplemental notice of termination was supported by credible evidence. Black argues that DCI did not prove he violated either prong of DCI Policy 7.0101.

### a. "Conduct Contrary to Professional Standards"

[¶21.] Black's principle argument is that "DCI was required to produce an independent expert witness who is qualified in the professional standards for law enforcement officers to establish the standard of conduct which is to be applicable to Black." This is necessary in Black's view because the definition of "conduct unbecoming of an officer" is "evasive, overly-broad, and wide reaching."

[¶22.] In response, DCI asserts that CSC's findings were not clearly erroneous and are fully supported by the record. DCI submits that the record is replete with evidence of unbecoming conduct, ranging from allegations of domestic abuse and emotional outbursts to severe and chronic lapses in judgment.

[¶23.] We agree with DCI. There is no rule that requires expert testimony. Expert testimony is admissible where it "will help the trier of fact to understand the evidence or to determine a fact in issue[.]" SDCL 19-19-702. But "[t]o be helpful, of course, expert opinion must offer more than something jurors can infer for themselves." *State v. Guthrie*, 2001 S.D. 61, ¶ 32, 627 N.W.2d 401, 415. An expert is not required to help the trier of fact decide whether an officer with a long history of emotional instability has shown conduct contrary to professional standards.

[¶24.] DCI presented four experienced witnesses who testified about Black's chronic misbehavior. We give great deference to the findings made by CSC because like a circuit court, CSC had the unique advantage of observing the witnesses and

judging their credibility in person. *See Hubbard v. City of Pierre*, 2010 S.D. 55, ¶ 26, 784 N.W.2d 499, 511 ("[T]he credibility of the witnesses, the import to be accorded their testimony, and the weight of the evidence must be determined by the trial court, and we give due regard to the trial court's opportunity to observe the witnesses and examine the evidence." (quoting *Baun v. Estate of Kramlich*, 2003 SD. 89, ¶ 21, 667 N.W.2d 672, 677)). Further, the mere fact that DCI's witnesses were DCI's employees does not invalidate their testimony. *See Donat v. Johnson*, 2015 S.D. 16, ¶ 17, 862 N.W.2d 122, 128 (holding that the potential for bias goes to weight of a witness's testimony, not admissibility). The testimony was bolstered by numerous exhibits verifying Black's conduct. Lastly, Black's repeated assertion that he was an effective DCI agent is irrelevant. It is undisputed that Black was an effective agent. CSC found, however, that his conduct was unprofessional and showed a lack of fitness to discharge his duties. This determination is not clearly erroneous.

### b. "Conduct Which Adversely Affects Morale or Efficiency"

[¶25.] Black argues CSC's finding that his conduct adversely affected the morale or efficiency of DCI or diminished public confidence is clearly erroneous. The heart of his assertion is that DCI only showed that Black's superiors were sick of hearing his name, not that the public or DCI employees suffered from diminished morale or efficiency as a result of Black's behavior.

[¶26.] Many of Black's missteps were highly visible. Black's comment on the Keloland blog was accessible to the entire world. Black's tape recording from the Brown County courthouse was published on the Internet. Black's spray paint

incident occurred in front of an entire neighborhood. Black's performance evaluations contained comments noting his sometimes poor relationships with others. Black sent out a resignation email to all DCI agents, as well as the Attorney General. Articles about Black appeared in the Aberdeen newspaper and on the Internet. Black has not contested the veracity of any of these instances of visible misconduct. Based on Black's extensive history of public misconduct and the testimony of DCI's witnesses, we cannot say that CSC's finding of fact on this matter is clearly erroneous.

[¶27.] Finally, Black raises two additional arguments. First, he claims that Director Gortmaker inappropriately added DCI Policy 7.0103 as another basis for his termination with reference to the alleged lie about his relationship with Lynda. Director Gortmaker, however, merely cited this as another reason for finding Black's termination appropriate. Director Gortmaker's only official action was to *affirm* Zeeb's decision. Second, Black challenges a number of specific factual findings in his brief. After review of the record, we find CSC's findings are supported by the record.

[¶28.] 2. Whether Black received due process of law.

[¶29.] Black argues that DCI failed to follow applicable rules and regulations when it terminated his employment, thereby denying him due process of law. Specifically, Black alleges DCI did not give him notice that prior disciplinary actions would be a basis for his termination. He further asserts that DCI fired him before the protection-order issue was resolved, that DCI improperly considered past conduct for which he had already been disciplined, and that Director Gortmaker

improperly added a ground for termination.  DCI, on the other hand, argues it fully complied with the requirements of due process and South Dakota law.  DCI claims it gave Black notice of its plan and multiple opportunities to be meaningfully heard.

[¶30.]     Black could only be terminated for just cause and with due process of law to protect his property rights in his job.  *See Hollander v. Douglas Cty.*, 2000 S.D. 159, ¶¶ 14-17, 620 N.W.2d 181, 185-86 (explaining whether an employee has a property right in continued employment and the due-process requirements involved); ARSD 55:10:07:04.  "Fundamentally, due process requires 'notice and an opportunity to be heard.'  These basic guarantees must be granted at a 'meaningful time and in a meaningful manner.'"  *Hollander*, 2000 S.D. 159, ¶ 17, 620 N.W.2d at 186 (citation omitted) (first quoting *Wuest v. Winner Sch. Dist. 59-2*, 2000 S.D. 42, ¶ 25, 607 N.W.2d 912, 918; then quoting *Schrank v. Pennington Cty. Bd. of Comm'rs*, 1998 S.D. 108, ¶ 13, 584 N.W.2d 680, 682).

[¶31.]     From our review of the record, it is apparent that Black received due process of law.  Zeeb sent his first letter to Black on February 13, 2014.  This letter placed Black on administrative leave in light of the content of Patty Black's petition for an ex parte protection order, which included a copy of Black's handwritten letter.  Contrary to Black's contention, Zeeb's letter advised: "You will remain on administrative leave without pay until this issue is resolved, or until further notice from me."  Further notice arrived in a letter to Black from Zeeb on February 21, 2014.  This letter informed Black that DCI intended to terminate his employment and cited ARSD 55:10:07:04(26) and DCI Policy 7.0101 as grounds.  It also

explained the factual and legal basis for its determination. Lastly, it informed Black of his right to appeal and the relevant procedures.

[¶32.]    Black wrote a letter to Zeeb on February 23, 2014, explaining his side of the story. Zeeb reconsidered his decision and investigated the matter again. On March 14, 2014, Zeeb sent Black a termination letter, fully explaining DCI's grounds to terminate his employment. This letter cited court documents, a report by the North Dakota Bureau of Criminal Investigation, audio recordings of Black and others, and text messages between Black and Patty. The letter explained the consequences of Black's chronic misbehavior and restated ARSD 55:10:07:04(26) and DCI Policy 7.0101 as grounds for termination. It also notified Black of his right to appeal Zeeb's decision.

[¶33.]    Black first appealed to Director Gortmaker, who affirmed Zeeb's decision. Then he appealed to the Attorney General, who also affirmed Zeeb's decision. Black then received a full hearing in front of CSC, presenting witnesses and exhibits while represented by counsel. CSC found DCI had just cause to terminate Black's employment. Black next appealed CSC's decision to the circuit court. The circuit court affirmed CSC's decision. Black received notice of all the complaints against him and had multiple opportunities to be heard. Black has proceeded through five levels of review. Nothing in the record suggests the due process he received was inadequate. Further, contrary to Black's assertion, DCI did not deny Black's rights by considering his history of misbehavior in addition to his admissions of domestic violence. *See Irvine v. City of Sioux Falls*, 2006 S.D. 20, ¶¶ 15-17, 711 N.W.2d 607, 611-12 (holding that there was just cause to terminate a

public employee who was good at his job but who had a long history of chronic misbehavior and poor relationships with others).

## CONCLUSION

[¶34.] CSC's finding that DCI had just cause to terminate Black's employment was fully supported by the record and not clearly erroneous. DCI complied with all rules and regulations and afforded Black due process of law. We affirm.

[¶35.] GILBERTSON, Chief Justice, ZINTER and SEVERSON, Justices, and MEIERHENRY, Retired Justice, concur.

[¶36.] MEIERHENRY, Retired Justice, sitting for WILBUR, Justice, disqualified.